1:06-M-135A

# AFFIDAVIT

I, Lisa McCarthy, being duly sworn, hereby depose and say:

1. I am a Special Agent with the United States Department of Health and Human Services, Office of Inspector General, Office of Investigations ("HHS-OIG") in the New England Region, Providence, Rhode Island Field Office. I have been with the HHS-OIG since July 1999, and as a special agent since June 2002. Prior to becoming a special agent, I was an auditor for HHS-OIG in the Boston Regional Office.

2. My training includes the completion of the Criminal Investigator Basic Training Course at the Federal Law Enforcement Training Center at Glynco, Georgia, in 2002. I also completed the Inspector General Training Program at Glynco, Georgia, in 2004. Based upon my training and experience, I am familiar with the Medicare and Medicaid programs, and their reimbursement policies and regulations.

3. This affidavit is based upon my own personal observations and participation in this investigation, my conversations with other law enforcement officers who have participated in this investigation, interviews with witnesses, and reviews of reports, documents, and other evidence obtained during the investigation. It does not contain every detail of this investigation; rather, it contains those facts that I believe are necessary and sufficient to establish probable cause for issuing the search and seizure warrants requested below.

## I. OVERVIEW OF INVESTIGATION

4. Since approximately August 2005, I have participated in an investigation of fraudulent activities by Dr. Tarek Wehbe ("Dr. Wehbe"). As more fully explained below, Dr. Wehbe is the President and owner of Renaissance Medical Group ("RMG"), a medical practice with offices in Providence and North Providence. Specifically, the investigation has uncovered evidence that Dr. Wehbe has been submitting fraudulent claims to Medicare, Medicaid, and private health insurance carriers in order to obtain reimbursements for services that were not rendered, up-coded, or medically unnecessary, in violation of 18 U.S.C. §§ 287 (false claims), 1347 (health care fraud), 1001 (false statements), 1035 (false statements relating to health care matters), 1341 (mail fraud), 1343 (wire fraud), and 1956(a)(1) (money laundering).

5. I submit this affidavit in support of:

a) a search warrant for RMG offices located at 790 North Main Street, Providence, Rhode Island ("the Providence Office"), as further described in Attachment A1 to this Affidavit;

b) a search warrant for RMG offices located at 1630 Mineral Spring Avenue, North Providence, Rhode Island ("the North Providence Office"), as further described in Attachment A2 to this Affidavit;

c) a seizure warrant for Citizens Bank account number 1103-411-4 in the name of Renaissance Medical Group, 790 North Main Street, Providence, Rhode Island 02904. The only authorized signatory on the account is Dr. Tarek Wehbe ("the RMG account");

d) a seizure warrant for Citizens Bank account number 0015649423, in the name of Tarek and Mathilda Wehbe, 5 Princess Pine Road, Lincoln, Rhode Island 02865. The only authorized signatories on this account are Tarek and Mathilda Wehbe ("the Wehbe account").

Based on the information set forth in this affidavit, I believe that the premises set forth in Paragraphs 3(a) and (b) will contain evidence, instrumentalities, and proceeds of the aforementioned offenses. I also believe, based on the information contained in this affidavit, that the bank accounts listed in Paragraphs 3(c) and 3(d) constitute evidence of the commission of a criminal offense, or constitute contraband, fruits of the crime, or things otherwise criminally possessed within the meaning of Fed. R. Crim. P. 41(b), and are subject to forfeiture and seizure pursuant to 18 U.S.C. §§ 981(a)(1)(A).

6. The locations set forth in Paragraphs 3a) and 3b) above are the offices of the medical practice of Dr. Wehbe, otherwise know as Renaissance Medical Group, Inc. ("RMG"). RMG is a medical practice comprised of twelve physicians specializing in internal medicine, oncology, and hematology. According to the Rhode Island Division of Employment Tax, RMG currently employs 52 individuals. The Rhode Island Secretary of State website lists RMG's date of incorporation as April 11, 2000. Its business purpose is identified as the general practice of medicine.

7. RMG's Providence Office was identified during this investigation through the following means: a) RMG's registered address with the Rhode Island Secretary of State's office; b) RMG's and Dr. Wehbe's address on each insurance carrier's provider agreement; c) the address on file

for RMG's bank account with Citizens Bank; c) trash pulls from this address contained documents addressed to RMG and/or Dr. Wehbe; d) undercover ("UC") operations were conducted at this location; and e) the two-story brick and tan building bears a sign, "Renaissance Medical Group." Based on information obtained during the course of this investigation, the Providence Office is open on weekdays with physicians, including Dr. Wehbe, seeing patients during normal business hours.

8. RMG's North Providence Office was identified during this investigation through the following: a) the two-story brick building is identified as RMG on a street sign located in the front parking lot; and b) trash pulls from this address contained documents addressed to RMG and/or Dr. Wehbe. Based on information I obtained by speaking with a receptionist in the North Providence Office, the office is open on weekdays, with physicians seeing patients on a daily basis. I was informed that Dr. Wehbe sees patients at the North Providence Office on Wednesdays.

## II. OPERATION OF THE HEALTH CARE PROGRAMS

### A. MEDICARE

9. Medicare is a federal health insurance program for persons 65 and older, as well as persons under 65 who are blind or disabled. Medicare was established under Title XVIII of the Social Security Act, 42 U.S.C. § 1395 et seq. The Medicare program is administered by the Centers for Medicare and Medicaid Services ("CMS"), an agency of HHS.

10. The Medicare program includes a voluntary supplemental insurance benefit known as "Part B," which is funded by insurance premiums paid by enrolled Medicare beneficiaries and contributions from the federal treasury. Part B pays for outpatient services such as doctor's office visits, laboratory services, and injectable drugs. The Part B program requires that beneficiaries bear some of the cost of their care. In general, Medicare covers 80 percent of the reasonable charges for services and equipment. Medicare beneficiaries or their supplemental insurance carriers are responsible for the remaining 20 percent.

11. The federal government provides reimbursement for Medicare claims through CMS. CMS contracts with private insurance organizations, referred to as "Carriers" under Part B, to receive, adjudicate, and pay Medicare claims submitted by approved and participating health care providers. These Carriers are required to administer the Medicare program according to

regulations established by CMS. Part B covered services must be submitted by a provider or supplier to the appropriate regional Carrier based upon the beneficiary's state of residence. During the time frame of this investigation, CMS had contracted with two different Part B Carriers to process and pay claims in Rhode Island: Blue Cross and Blue Shield of Rhode Island ("BCBSRI") and Blue Cross and Blue Shield of Arkansas ("BCBSAK"). BCBSRI processed claims between January 2000 and January 2003. BCBSAK has processed all Part B Medicare claims from Rhode Island since February 2003.

12. In 1996, Congress enacted the Health Insurance Portability and Accountability Act (HIPPA), which authorized CMS to contract with entities other than Medicare Carriers and Fiscal Intermediaries to perform certain program safeguard activities. As a result, CMS created Program Safeguard Contractors (PSCs). PSCs are empowered by CMS under 42 U.S.C. §1893(b) to review the activities of providers who receive Medicare payments. In New England, the PSC authorized by CMS to perform program integrity reviews is known as the Benefit Integrity Support Center (BISC). The BISC's functions include medical policy development, prepay and post-pay medical review of claims, and data analysis.

**B. MEDICAID**

13. The Rhode Island Medical Assistance Program ("Medicaid") is jointly funded by the state and federal governments and managed by the Rhode Island Department of Human Services ("DHS"), to provide health care benefits to certain low-income individuals and families as determined by federal and state law. The federal share of the Rhode Island Medicaid program between 2000 and 2005 has ranged between 52.45% to 56.03%. DHS has subcontracted the responsibility of processing and reviewing Medicaid claims and payments to Electronic Data Services, Inc. ("EDS").

14. The State of Rhode Island also has a Medicaid Managed Care Program (MCO). The State contracts with managed care organizations to administer a health care program to Medicaid recipients. Each contracted MCO is paid a set amount per month for each patient enrolled in the program. The MCOs, in turn, contract with health care providers to render services to patients enrolled in the program.

15. The State of Rhode Island has established a Surveillance and Utilization Review Subsystem ("SURS") to ensure proper and efficient administration of the Medicaid program. The SURS unit reviews provider claim patterns and histories for statistical aberration. Providers

identified through this review may then be subject to more detailed claim examination, including review of medical records underlying the suspect transactions. The Medicaid claims data is electronically maintained by Rhode Island's Medicaid Management Information Systems ("MMIS") division.

## C. PRIVATE HEALTH INSURANCE COMPANIES

16. There are a number of private health insurance companies that operate in Rhode Island, such as Blue Cross and Blue Shield of Rhode Island ("BCBSRI") and United Healthcare ("UHC"). These insurance companies pay claims for medical services submitted by registered providers on behalf of its subscribers.

## D. PROVIDER AGREEMENTS AND CLAIM SUBMISSIONS

17. In order to bill the insurance carriers, healthcare providers and suppliers such as doctors, physical therapists, and medical supply companies, must have their own individual provider number. In order to obtain a provider number, the provider must sign a provider agreement with each carrier acknowledging that the provider: 1) is familiar with billing requirements; 2) promises not to submit false or fraudulent claims; 3) agrees to abide by the rules, regulations, policies and procedures governing reimbursement; and 4) will keep and allow access to records and information as required by each carrier. The provider agrees to provide the subscribers with those services which are medically necessary, within the scope of the physician's license, in accordance with applicable standards for patient care and appropriate utilization of inpatient, ambulatory, ancillary, and emergency services, in accordance with all applicable laws, regulation and rules of professional ethics. The enrolled providers, together with authorized agents, employees, and contractors are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and applicable polices and procedures issues by the Carriers. Title 1862 of the Social Security Act provides that "Notwithstanding any other provision of this title, no payment may be made under part A or part B for any expenses incurred for items or services – 1(A) which….are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member,… which are not reasonable and necessary for the prevention of illness…."

18. In Rhode Island, group providers such as a physician's practice or a physical therapy clinic, submit claims to Medicare or Medicaid using a group provider number. Although claims are submitted under a group number, the rendering physician must be identified using his/her individual billing number. In this case, RMG submits claims to Medicare and Medicaid using provider numbers 119080024 and RM37272, respectively. Each claim submitted with RMG's provider number, also identifies the physician rendering the services. The following have been determined as Dr. Wehbe's individual provider number for each of the corresponding health insurance carriers:

a. Medicare – 007008879;
b. Medicaid – 9002435;
c. Blue Cross and Blue Shield of Rhode Island – RI8875;
d. Blue Cross Rite Care – CP00005375;
e. Neighborhood Health Plans of Rhode Island – 000000001811; and,
f. United Health Care – 139954.

19. Dr. Wehbe enrolled and signed provider agreements with all of the above providers, with the exception of Medicaid, before January 1, 2000. Dr. Wehbe enrolled and signed a provider agreement with Medicaid on May 1, 2001.

20. Providers submit claims to health insurance carriers on a standardized form, commonly referred to as a CMS-1500 form, or they can submit their claims electronically. In this case, RMG submits its claims to all of the Carriers electronically, by means of a computer. Those claims are then processed by the Carriers. In the case of Medicaid, payment is made to RMG through a direct deposit into RMG's bank account, as further described below. The other Carriers mail reimbursement checks to RMG's Providence Office.

## E. EVALUATION AND MANAGEMENT CODES

21. Providers who perform medical services are required to submit claims for payment using codes to describe the services rendered to patients. These codes are assigned by the American Medical Association and designated as Current Procedural Terminology ("CPT"), or procedure codes, to commonly identify medical services for billing purposes. These codes are standardized and are used for all health care insurance carriers. Each CPT code is assigned an allowable charge and published on fee schedules specific to each carrier. The CPT manual has definitive

documentation guidelines that are required for each level of service code within various evaluation and management ("E/M") categories. The E/M section is divided into broad categories such as office visits, hospital visits and consultations. Most of the categories are further divided into two or more subcategories of E/M services. For example, there are two subcategories of office visits (new patient and established patient). The subcategories are further classified into levels of E/M services that are identified by specific codes. This classification is important because the nature of physician work varies by type of service, place of service, and patient's status.

22. The basic format of the levels of E/M services is the same for most categories. First, a unique code number is listed. Second, the place and/or type of service are specified. Third, the content of the service is defined. Fourth, the nature of the presenting problem(s) usually associated with a given level is described. Fifth, the time typically required to provide the service is specified. The descriptor for the levels of E/M service recognizes seven components. Of these, six are used in defining the levels of E/M services. The seven components to the code selection are: the extent of history; the extent of exam; the extent of medical decision making; counseling; coordination of care; nature of presenting problem; and amount of time spent with the patient[1]. The history, exam, and medical decision making are the key components when selecting the level of code. The next three components (counseling, coordination of care, and the nature of the presenting problem) are considered contributory factors in the majority of encounters. Although the first two of these contributory factors are important E/M services, it is not required that these services be provided at every patients encounter.

23. The CPT manual describes codes 99211 through 99215 as an "[o]ffice or other outpatient visit for the evaluation and management of an established patient." There are different levels of E/M codes depending on the complexity of the visit. A level 1 visit (code 99211) corresponds to the lowest level of service, while a level 5 visit (code 99215) represents the highest level of

[1] The specific times expressed in the visit code descriptors are averages, and therefore represent a range of times, which may be higher or lower depending on actual clinical circumstances. The time considered for E/M codes for office visits is face-to-face time defined as only the time that the physician spends face-to-face with the patient and/or family. This includes the time during which the physician performs such tasks as obtaining a history, performing an examination, and counseling the patient. It does not count pre- and post-encounter time, which may be spent reviewing records and tests, arranging for further services, and communicating with other professionals.

service. Each code level requires a certain number of the medical key components. Reimbursement amounts usually increase as the code level increases:

a. CPT code 99215 is defined by the AMA as an, "Office or other outpatient visit for the evaluation and management of an established patient, which requires at least two of these key components: 1) A detailed history; 2) A detailed examination; or 3) Medical decision making of a high complexity. Usually the presenting problem(s) are of a moderate to high severity. The physician typically spends 40 minutes face-to-face with the patient."

b. CPT code 99214 is defined by the AMA as an, "Office or other outpatient visit for the evaluation and management of an established patient, which requires at least two of these key components: 1) A detailed history; 2) A detailed examination; or 3) Medical decision making of a moderate complexity. Usually the presenting problem(s) are of a moderate to high severity. The physician typically spends 25 minutes face-to-face with the patient."

c. CPT code 99213 is defined by the AMA as an, "Office or other outpatient visit for the evaluation and management of an established patient, which requires at least two of three key components: 1) An expanded problem focused history; 2) An expanded problem focused examination; and 3) A medical decision of low complexity. Usually, the presenting problem(s) are of low to moderate severity. They physician typically spends 15 minutes face-to-face with the patient."

d. CPT code 99212 is defined by the AMA as an, "Office or other outpatient visit for the evaluation and management of an established patient, which requires at least two of three key components: 1) a problem focused history; 2) a problem focused examination; and 3) straightforward medical decision making. Usually the presenting problem(s) are self-limited or minor. The physician typically spends 10 minutes face-to-face with the patient."

e. CPT code 99211 is defined by the AMA as an, "Office or other outpatient visit for the evaluation and management of an established patient, that may not require the presence of a physician. Usually, the presenting problem(s) are minimal. Typically five minutes are spent performing or supervising these services.

24. The following chart displays sample reimbursements amounts for 99211-99215 for each Carrier for the year 2004:

| Established Patient E/M Code Reimbursement Amounts 2004 | | | | | |
|---|---|---|---|---|---|
| | 99211 | 99212 | 99213 | 99214 | 99215 |
| Medicare | $17.84 | $ 31.38 | $ 43.69 | $ 68.15 | $ 98.54 |
| Medicaid | $ 8.05 | $ 20.64 | $ 60.64 | $ 27.00 | $ 32.00 |
| NHPRI (MCO) | $19.40 | $ 31.40 | $ 41.78 | $ 65.50 | $ 95.86 |
| Blue Cross Rite Care (MCO) | $10.57 | $20.31 / $27.50* | $28.98 / $39.00* | $43.50 / $50.00* | $ 68.63 |
| Blue Cross Private | $26.60 | $33.25 / $39.25** | $47.50 / $54.61** | $64.60 / $71.21 / $85.19*** | $104.50 / $123.17** |
| UHC Private | $16.40 | $ 29.11 | $ 46.13 | $ 51.25 | $ 51.25 |

*On 10/1/2004 the reimbursement amount changed
** On 8/1/2004 the reimbursement amount changed
*** On 3/1/04 AND 8/1/04 the reimbursement amount changed

## III. THE INVESTIGATION

### A. MEDICARE

#### 1. Patient-Based Review

25. On October 18, 2005, I met with Walter Reynolds, Chief Investigator, Cindy Cote, Registered Nurse, and Linda Morracco, Medicare Medical Review Specialist, from Blue Cross Blue Shield of Rhode Island (BCBSRI). I was informed that in 2002, Medicare performed two medical reviews on Dr. Wehbe's 99215 claims. The reviews were initiated when Dr. Wehbe was identified by BCBSRI as having substantially higher billing levels than his peers (other Internists in Rhode Island). Specifically, Dr. Wehbe was the highest biller of E/M code 99215 (278) between July 1, 2001, and December 31, 2001. The next closest physician billed 150 99215-codes during the same time period.

26. As part of this investigation, I obtained the documents associated with the 2002 Medicare reviews. The following is a summary of these documents:

a. Dr. Edward Martin, MD, a physician consultant for Medicare, reviewed 32 medical records related to the claims Dr. Wehbe submitted for CPT code 99215. All 32 claims were either denied or re-coded down at least two CPT code levels, resulting in an error rate of 100%. Specifically, twenty-seven (85%) claims were down-coded three levels to 99212, two (6%) claims were down-coded two levels to 99213, and three (9%) claims were denied due to no documentation.

b. Dr. Wehbe was informed of the results of this review in a letter from RIMS dated September 24, 2002. This letter also informed Dr. Wehbe that as a result of the initial review, all of his 99215 claims were subject to a prepayment medical review until significant improvement

was maintained. BCBSRI attached copies of the E/M guidelines published in the September/November 1994 and July/August 1997 Medicare memos.

c. On April 21, 2003, BCBSRI wrote a letter to Dr. Wehbe outlining the results of the prepayment review of his 99215 claims for the period September 24, 2002 through March 31, 2003. Of 30 claims reviewed, twenty-two (73%) claims were down-coded three levels to 99212, two (7%) claims were down-coded two levels to 99213, and six (20%) claims were denied because the medical records did not indicate that the services were rendered. BCBSRI enclosed a copy of the Evaluation and Management Documentation from CMS and also advised that additional information was available on the Internet at the CMS and Rhode Island Medicare websites.

d. On November 19, 2003, BCBSRI wrote a letter to Dr. Wehbe outlining the results of the prepayment review of his 99215 claims for the period April 1, 2003 through September 30, 2003. Of 32 claims reviewed, twenty-four (75%) claims were down-coded three levels to 99212, one claim (3%) was down-coded two levels to 99213 and seven (22%) claims were determined to be medically unnecessary and were denied. This letter advised Dr. Wehbe that Medicare information is available on the Internet at the CMS and Rhode Island Medicare websites and it gave an additional website for documentation guidelines for E/M services. The letter also informed Dr. Wehbe that a meeting would be set up to discuss his billing practices.

e. On January 13, 2004, Linda Hunt Morrocco, MRUR Specialist, Dr. Parker J. Staples, Carrier Medical Director, and Dr. Edward Martin, Medical Review Consultant, met with Dr. Wehbe. The group discussed Dr. Wehbe's billing and documentation practices, why his 99215 codes were being denied, and how services are properly coded and documented. I obtained a copy of the sign-in sheet for the meeting that was initialed by all attendees, including Dr. Wehbe.

f. BCBSRI sent a letter to Dr. Wehbe dated January 14, 2004, the day following the meeting. BCBSRI enclosed clinical examples from the 2003 Current Procedural Terminology (CPT) book, a copy of the 1997 Documentation Guideline for Evaluation and Management Services, and the American Medical Association customer services telephone number to purchase a 2004 CPT book.

g. On September 30, 2004, the reviewers sent Dr. Wehbe a letter notifying him that the prepayment medical review of all 99215 claims which had started on September 24, 2002, was completed. According to the letter, Dr. Wehbe's documentation of claims billed had improved

sufficiently and satisfied BCBSRI's documentation requirements. As a result, Dr. Wehbe was removed from the provider specific audit on August 30, 2004.

27. On May 18, 2006, Medicaid Fraud Control Unit (MFCU) Investigator Thomas Bouchard, Food and Drug Administration Task Force (FDA-TF) Agents Albert Faella and Alan Ross, and I interviewed Dr. Edward Martin. Dr. Martin is currently the Chief of Medical Staff at Eleanor Slater Hospital. Dr. Martin participated in Medicare's medical record review of Dr. Wehbe's 99215 claims. Dr. Martin told the investigators that he specifically recalled the meeting with Dr. Wehbe on January 13, 2004, because of Dr. Wehbe's demeanor during the meeting. Dr. Martin explained that while most physicians would get very upset when Medicare informs them that they were doing something wrong, Dr. Wehbe appeared unmoved by the audit and did not contest any of the findings. Dr. Martin recalled that his review of Dr. Wehbe's 99215 claims showed that they were up-coded and should have been billed as 99212 codes. Dr. Martin recalled that Dr. Wehbe billed follow-up visits as 99215. Dr. Martin's opinion is that it is very rare that a follow-up visit for even a complex diagnosis would still require a 99215. Dr. Martin also recalled that many of the services he reviewed were documented by someone other than Dr. Wehbe. Although he could not remember the number of claims, he recalled that in those cases where the services were documented by someone other than Dr. Wehbe, it was usually by a medical student from Brown University, identified by "BMS" and a number.[1]

**2. Peer Analysis Review**

28. I reviewed the BISC's peer comparison charts of E/M codes billed by Internists in Rhode Island for 2002 - 2005. The analysis showed the number of times each E/M code was billed by

---

[1] I researched Medicare's policy as it relates to medical students performing services and as stated in the Medicare Carrier's Manual, Chapter 13, Section 100, "A student is an individual who participates in an accredited educational program (e.g., a medical school) that is not an approved GME [graduate medical education] program. A student is never considered to be an intern or a resident. Medicare does not pay for any services furnished by a student." The manual further states that any contribution and participation of a student to the performance of a billable service must be performed in the physical presence of a teaching physician. Student may document services in the medical records, however, the documentation of an E/M service by a student that may be referred to by the teaching physician is limited to documentation related to the review of systems and/or past family/social history. The teaching physician may not refer to a student's documentation of physical exam findings or medical decision-making is his or her personal note. If the medical student documents E/M services, the teaching physician must verify and re-document the history of present illness as well as perform and re-document the physical exam and medical decision making activities of the service.

Dr. Wehbe, as well as how that number compared to the number of times that E/M code was billed by other physicians in Rhode Island. This comparison is known as a "relative 2 ratio" ("RR2"). Thus, if the RR2 is equal to one (1) then the provider's RR2 is equal to the Peer Ratio. If the RR2 result is greater than one (1), it indicates a higher utilization pattern by the physician as compared to his/her peers.

29. In 2002, Dr. Wehbe billed 469 99215 codes, resulting in a RR2 of 2.6, and 1312 99214codes, resulting in a RR2 of 3.5. In 2003, following Medicare's review of Dr. Wehbe's 99215 claims discussed in the previous section, Dr. Wehbe billed code 99215 only 29 times, a decrease of 94%. Although Dr. Wehbe's billing of 99215 decreased, his billings of 99214 increased from 1312 visits in 2002, to 1829 visits in 2003, an increase of 39% resulting in his RR2 increasing from 3.50 to 3.95. In 2004, Dr. Wehbe maintained his lower billing of code 99215, but more evenly billed codes 99213 and 99214 resulting in a 767% increase in code 99213 and a 36% decrease in 99214. Despite these changes, Dr. Wehbe's billing of codes 99213 and 99214 were still significantly higher than his peers (99213 RR2 was 2.68 and 99214 RR2 was 2.67). In 2005, Dr. Wehbe once again increased his billing of code 99214, which represented 86% of his 2005 billings. His 2005 RR2 for code 99214 was 3.91, the highest ratio out of all the providers in Rhode Island. The only E/M codes that remained consistent throughout this review were 99211 and 99212. Dr. Wehbe's billing of these codes was always between .3% and 2.3% of his total billings.

30. The chart below further summarizes the results of the review.

**Dr. Wehbe's E/M code billing compared to his peers**

| | [redacted] | | [redacted] | | [redacted] | | [redacted] | | [redacted] | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 99211 | RR2 | 99212 | RR2 | 99213 | RR2 | 99214 | RR2 | 99215 | RR2 |
| 2002 | [redacted] | 0.71 | [redacted] | 0.89 | [redacted] | 1.14 | [redacted] | 3.5 | [redacted] | 2.6 |
| 2003 | [redacted] | 0.66 | [redacted] | 1.08 | [redacted] | 0.85 | [redacted] | 3.95 | [redacted] | 1.1 |
| 2004 | [redacted] | 0.66 | [redacted] | 0.8 | [redacted] | 2.68 | [redacted] | 2.67 | [redacted] | 1.08 |
| 2005 | [redacted] | 0.83 | [redacted] | 1.88 | [redacted] | 1.39 | [redacted] | 3.91 | [redacted] | 1.02 |

Accordingly, it appears that following Medicare's review of his 99215 billings, Dr. Wehbe adjusted his billing practices by significantly decreasing his billing of the highest code, and simultaneously increasing his billing of the next highest codes, that is 99213 and 99214.

**B. MEDICAID**

**1. Patient-Based Reviews**

31. In 2005, Vivian Cardoza ("Cardoza"), a Registered Nurse and the lead Surveillance and Utilization Review Subsystem ("SURS") Reviewer with EDS, reviewed medical records related to 215 E/M services with dates of service between April 1, 2004 and June 30, 2005 which were billed to Medicaid, where Dr. Wehbe was listed as the rendering physician. According to Cardoza's report, 85% of the claims for office visits submitted by Dr. Wehbe during this time period were for codes 99214 and 99215.

32. Cardoza's audit report stated in part: "The documentation submitted for review was not complete in several areas. No physician orders were noted but some results of testing were included. In several instances, the second page of a two page report was missing. Numerous reports of the results for diagnostic procedures and all the administration records for Remicade infusions were also missing. . . . Lab procedures were ordered excessively and many did not appear to be medically necessary because lab procedures were repeated when previous results were normal and tests that should have been drawn while the patient was fasting, were not. . . . It does appear that Dr. Tarek Wehbe or someone signing a "T" or "TW" wrote most of the office records attributed to Dr. Wehbe."

33. I reviewed the documentation collected by Cardoza. Cardoza determined that out of the 215 E/M services reviewed, 24 services did not have any documentation supporting the service, 113 services were up-coded one level, 58 services were up-coded two levels, three services were up-coded three levels, and fifteen services were appropriately billed. The total error rate for this review was 93%. Out of the $8,792 Medicare and Medicaid paid to Dr. Wehbe for E/M services, $3,111 was deemed by Medicaid as an overpayment.[2]

34. Cardoza's review also addressed Dr. Wehbe's billing of E/M codes with a modifier "25[3]" when there was no evidence in the medical records of a second visit being performed or

---

[2] Cardoza reviewed all services that were submitted as part of the evaluation and management visit (i.e. labs, tests, infusions, etc.). The figures and overpayment dollar amounts reported are only related to the E/M services and not the ancillary services associated with the office visit.

[3] Modifier 25 is used to identify a significant, separately identifiable evaluation and management service by the same physician on the same day of the procedure or other service: the physician has to indicate that on the day a procedure or service identified by a CPT code was performed, the patient's condition required a significant, separately identifiable E/M services above and beyond the other services provided or beyond the usual preoperative and postoperative care associated with the procedure that was performed.

documentation indicating that a separate identifiable services were performed. The medical record often noted that the patient had no complaints.

35. Cardoza summarized the areas of concern by listing the following billing and quality of care issues: a) upcoding office visits; b) unnecessary office visits or phantom visits[4]; c) performing and billing unnecessary lab services; d) poor documentation of patient histories or treatments; e) lack of follow-up care; and f) public health threat.

36. Dr. Raymond Maxim, a Consulting Medical Director for the DHS, performed an independent review of the same medical records that were reviewed by Cardoza. Dr. Maxim reviewed 279 E/M services and the ancillary services performed during the E/M visit.[5] In a letter dated June 8, 2006, Dr. Maxim outlined the results of his review. Dr. Maxim had multiple areas of concern. Dr. Maxim found that of the 279 records reviewed, the vast majority (99.2%) of the physician notes failed to meet the documentation necessary to support the level of E/M codes billed. Dr. Maxim found that 35% should be down-coded one level, 49.8% should be down-coded two levels, and .7% should be down-coded three levels. Dr. Maxim also noted that the frequency of the visits for follow-up exams were not medically necessary for the documented condition where some patients had as many as 16 visits in a 14-month period. Dr. Maxim also noted that there was no documentation of physician orders for laboratory tests for any of the lab results provided in the medical record. There was a pattern of excessive lab use and unbundling[6] of lab services with the possible intent to maximize reimbursement.

**2. Peer Analysis Review**

37. Marsh Beuhauer, RN, a SURS Review Nurse for EDS, performed a Medicaid provider analysis comparing E/M codes billed by Dr. Wehbe to E/M codes billed by other internist in Rhode Island. I received a copy of the results of this review from the Medicaid Fraud Control Unit ("MFCU"). My summary of the results are as follows. From 2002 through 2004, Dr. Wehbe billed 83% of the 99215 codes submitted by all internists in Rhode Island. During the same time period, Dr. Wehbe billed 2% of the 99213 codes submitted by all internists in Rhode Island. In 2005, Wehbe's utilization of the 99215 code decreased, but his billing for code 99214

[4] Phantom visits refer to services that were billed but may not have been rendered.

[5] Dr. Maxim reviewed 64 additional services. He reviewed all services contained in the medical records he received, while Cardoza only reviewed the dates of service between April 1, 2004 and June 30, 2005.

[6] Certain laboratory services are bundled into one CPT code and are reimbursed at a lower rate due to the simplicity at running the certain tests at the same time. Unbundling of laboratory services occurs when the provider bills using each individual tests CPT code instead of the one CPT which represents all tests within the category.

increased. In 2005, Dr. Wehbe billed 31% of 99215 codes submitted by internists in Rhode Island. In 2005, Dr. Wehbe billed 42% of 99214 codes submitted by internists in Rhode Island. Dr. Wehbe's billing of the 99214 code increased from 17% in 2002 to 42% in 2005. Based on this analysis, I believe that the majority of internists in Rhode Island bill most of their office visits as 99211, 99212, and 99213, while Dr. Wehbe billed primarily 99214 and 99215.

**C. PRIVATE HEALTH CARE CARRIERS**

**1. Blue Cross and Blue Shield Review**

38. BCBSRI reviewed Dr. Wehbe's billing for services rendered between April 2004 and March 2005. The review included E/M, laboratory, and echocardiogram services. The review showed that 73% of Dr. Wehbe's bills were coded as 99214, while the peer group only billed that code 26% of the time. As a result of Dr. Wehbe billing higher level of E/M codes, Dr. Wehbe's patient base had a higher cost per patient ($268.68) for office visits, than his peers ($86.36).

**2. United Healthcare Review**

39. UHC reviewed Dr. Wehbe's billing for services rendered between April 1, 2004 and March 31, 2005. Dr. Wehbe's costs exceeded those of his peers in every category. Dr. Wehbe's cost per patient was $573.84, 223% higher than his peers. His cost per visit was $122.29, 57% higher than his peers. Dr. Wehbe's patients had an average of 5.69 visits and an average of 10.67 procedures per patient, while the peer group's patients only had 2.28 visits and 3.40 procedures per patient. Dr. Wehbe billed E/M code 99214 77.8% of the time and 99215 4.2% of the time, while his peers bill 99214 22.8% of the time and 99215 2.4% of the time. This E/M code billing pattern resulted in a 241% variance from his peers for code 99214, and a variance of 75% for code 99215

**D. EVALUATION AND MANAGEMENT CODES REVIEW**

40. During the course of this investigation, I and other investigators, analyzed the data provided by the Carriers identified above. The following lists the date range for which data was obtained for each carrier:

a. Medicare – January 2, 2002 – June 14, 2005;

b. Medicaid – September 1, 2001 – July 5, 2005;

c. Blue Cross Rite Care – October 1, 2001 – July 8, 2005;

d. Blue Cross and Blue Shield – January 2, 2002 – November 1, 2005;

e. United Healthcare – January 2, 2002 – November 7, 2005;

f. Neighborhood Health Plans of Rhode Island – January 10, 2000 – June 29, 2005.

In combining the data from the Carriers, we determined that approximately 77% of Dr. Wehbe's billings are for high-level E/M codes. In addition, not only is Dr. Wehbe's pattern of E/M codes billed inconsistent with most physicians of his specialty, the number of E/M visits Dr. Wehbe bills per day is impossible for any physician to perform. Dr. Wehbe's average billing day consists of 38 E/M visits per day. My review showed that in 47% of the days in the review period, Dr. Wehbe billed for more than 25 visits a day.[7] The majority of the codes billed for those days are high level E/M codes which signify visits typically lasting at least 25 minutes. Obviously this indicates that Dr. Wehbe is either inflating the number of patient visits, exaggerating the complexity of those visits, or both.

41. During the time period under investigation, Dr. Wehbe had days where he billed 50 to 70 visits in one day. For example, Dr. Wehbe billed the Carriers for 78 E/M office visits for December 27, 2002. The approximate time that would have been necessary for Dr. Wehbe to perform these visits is about 33.6 hours.[8]

42. On September 10, 2004, Dr. Wehbe billed the Carriers for 72 E/M office visits. The approximate time required for Dr. Wehbe to perform the visits he billed for September 10, 2004 would have been 28 hours. Comparatively, six of the other RMG physicians billed the Carriers for a total of 69 E/M office visits for September 10, 2004. This is an average of approximately 11 patients seen by each of the six physicians on September 10, 2004.

43. Dr. Wehbe billed the Carriers for 68 E/M office visits for May 14, 2004. The approximate time required for Dr. Wehbe to perform the visits he billed for May 14, 2004 would have been 27 hours. Comparatively, six of the other RMG physicians billed the Carriers for a total of 51 E/M office visits for May 14, 2004. This is an average of approximately 8 patients seen by each of the six physicians on May 14, 2004.

7 Only office and outpatient visits and consultation E/M codes were used for this analysis. There are other E/M codes for hospital inpatient services, which were billed by Dr. Wehbe, but were not used for the E/M analysis.

8 I have determined the average time by reviewing each procedure code billed and taking the typical time for such a code from the CPT manual and then multiplying said code by the number of visits utilizing that code. Thus, if the typical time for code 99214 is 25 minutes and Dr. Wehbe billed three such codes on a particular day, I would multiply 25 minutes times three. I would then add up all the other codes billed in the same manner.

44. Dr. Wehbe billed the Carriers for 63 E/M office visits for January 7, 2005. The approximate time required for Dr. Wehbe to perform the visits he billed for January 7, 2005 would have totaled 25.4 hours. Comparatively, five of the other RMG physicians billed the Carriers for a total of 40 E/M office visits for January 7, 2005. This is an average of approximately 8 patients seen by each of the five physicians on January 7, 2005.

45. Dr. Wehbe billed the Carriers for 58 E/M office visits for June 18, 2004. The approximate time required for Dr. Wehbe to perform the visits he billed for June 18, 2004 would have been 25.6 hours. Comparatively, five of the other RMG physicians billed the Carriers for a total of 76 E/M office visits for June 18, 2004. This is an average of approximately 15 patients seen by each of the other five physicians on June 18, 2004.

46. Dr. Wehbe billed the Carriers for 55 E/M office visits for February 4, 2006. The approximate time required for Dr. Wehbe to perform the visits he billed for February 4, 2005 would have been 23.6 hours. Comparatively, six of the other RMG physicians billed the Carriers for a total of 43 E/M office visits for February 4, 2005. This is an average of approximately seven patients seen by each of the six physicians on February 4, 2005.

47. Dr. Wehbe billed the Carrier for 46 E/M office visits for October 26, 2004. The approximate time required for Dr. Wehbe to perform the visits he billed for October 26, 2004 would have been 19.4 hours. Comparatively, six of the other RMG physicians billed the Carriers for a total of 76 E/M office visits for October 26, 2004. This is an average of approximately twelve patients seen by each of the six physicians on October 26, 2004.

48. Dr. Wehbe billed the Carriers for 49 E/M office visits for April 29, 2005. The approximate time required for Dr. Wehbe to perform the visits he billed for April 29, 2005 would have been 19.25 hours. Comparatively, five of the other RMG physicians billed the Carriers a total of 61 E/M office visits for April 29, 2005. This is an average of approximately 12 patients seen by each of the five physicians on April 29, 2005.

## E. REMICADE INFUSION

### 1. Explanation of Remicade

#### *A. Information from the Manufacturer*

49. Remicade (also known as Infliximab, the active ingredient in Remicade) is manufactured by Centocor. Remicade is an advanced biologic agent that has been shown to have substantial

benefits in patients with a number of inflammatory disorders involving the immune system. Remicade targets specific proteins in the body's immune system to help control the development of inflammation, significantly reducing painful symptoms in diseases such as ulcerative colitis, Crohn's disease, ankylosing spondylitis, psoriatic arthritis, and rheumatoid arthritis. While Remicade does not cure the diseases, it might reduce inflammation in the body and help the patient feel better. Remicade can also cause serious side effects and can reduce the body's ability to fight infections.

50. According to the manufacturer's website, Remicade is given by IV infusion, a process that usually takes about two hours. A healthcare professional administers the treatment in a supervised environment, which is either a physician's office or a treatment center. Remicade dosing is dependent upon the patients' diagnosis and body weight. The recommended dosing for patients with Rheumatoid Arthritis is three milligrams of Remicade for every kilogram of body weight. Patients receive the first dose followed by additional doses at two and six weeks after the first dose, then every eight weeks thereafter. For patients who have an incomplete response, consideration may be given to adjusting the dose up to 10 milligram per kilogram or treating every four weeks bearing in mind that risk of serious infections is increased at higher doses.

51. Remicade must be administered (after it is reconstituted with sterile water and Sodium Chloride) over a period of not less than two hours and must use an infusion set with an in-line, sterile, non-pyrogenic, low-protein-binding filter (pore size of 1.2 micrometers or less).

52. According to Centocor's Medication Guide for Remicade, serious and sometimes fatal side effects have been reported in patients taking Remicade. These include: serious infection, such as tuberculosis or hepatitis B; cancer; heart failure; liver injury; blood problems; nervous system disorders; allergic reactions; and lupus-like syndrome. Physicians should perform a complete medical history and physical prior to treating patients with Remicade. Patients who have or are prone to the above mentioned conditions will need to be examined by the physician to determine whether Remicade treatment could jeapordize the patient's health. Centorcor's medication guide advises that physicians should test patients for a latent tuberculosis infection and hepatitis B virus prior to and during Remicade treatments. Patients who have been treated for rheumatoid arthritis, Chron's disease, ankylosing spondylitis, psoriatic arthritis for a long time may be more likely to develop lymphoma or other cancers. Patients with congestive heart

failure should be monitored closely while taking Remicade; congestive heart failure may get worse.

*B. Information from the American College of Rheumatology*

53. Biologic agents have been approved by the FDA to treat moderate to severe rheumatoid arthritis that has not responded to an adequate trial of one or more disease modifying antirheumatic drugs ("DMARDs"), such as methotrexate, leflunomide, hydroxychloroquine, sulfasalazine. Because of their expense and side effects, most people with mild to moderate rheumatoid arthritis are treated with methotrexate before a biologic agent is used unless they are unable to take methotrexate because of side effects or other conditions. Biologic agents such as Remicade may be used alone, but are often given in conjunction with other DMARDs to increase the benefit and limit potential side effects.

54. Remicade must be given by an injection under the skin or by intravenous (IV) infusion. Remicade must be stored in a refrigerator and warmed to room temperature prior to use. Remicade infusions are either done through an IV line in the doctor's office or specialized infusion centers. These treatments usually take two to three hours.

55. Remicade usually work quickly to relieve the symptoms and swelling associated with rheumatoid arthritis. Although the studies show that most patients will improve within 4- 6 weeks of treatment, most patients will notice marked improvement after the first or second injection.

56. The most common side effects seen with the injectable medicines include skin reactions called "injection site reactions." Skin reactions to injection occur in less than 30% of patients and patients usually complain of localized rash, burning, or itching at the site of injection. The most significant side effect of these medications is an increase the risk of all types of infections, including tuberculosis (TB). Before starting Remicade infusion therapy, a TB skin test is usually done. Treatment with should be stopped if the patient has an active infection or is taking an antibiotic. Remicade can cause allergic reactions. There are rare neurologic complications from Remicade and people with multiple sclerosis should not use it. People with significant congestive heart failure should not take Remicade.

58. The CPT code for Remicade is J1745, "Injection, infiximab, 10mg." Each carrier has its own coverage policies and reimbursement amounts for Remicade. Blue Cross and Blue Shield of Rhode Island is the only carrier that does not reimburse for Remicade treatments. The

following chart illustrates Dr. Whebe's reimbursement amounts by all the Carriers (save BCBS private) for the time periods indicated.

**Dr. Wehbe's Remicade Totals**

| | MEDICAID | MEDICARE | BCBS RITE | BCBS PRIVATE | UHC PRIVATE | NHPRI | [redacted] |
|---|---|---|---|---|---|---|---|
| REMICAID | $ 448,479.92 | $ 472,741.35 | $ 55,178.00 | | $ 140,217.80 | $ 149,331.21 | [redacted] |
| INFUSION | $ 11,261.70 | $ 26,541.92 | $ 784.49 | | $ 6,999.64 | $ 7,897.06 | [redacted] |
| 2005 Remicade reimbursement rate per 10 mg | $ 53.08 | $ 42.47 | $ 58.70 | n/a | $ 69.16 | $ 58.78 | |
| DATES | 9/1/01-7/5/05 | 1/2/02-6/14/05 | 10/1/01-7/8/05 | 1/2/02-11/1/05 | 1/2/02-11/7/05 | 1/10/00-6/29/05 | 1/10/00-10/31/05 |

2. **Medicaid Reviews of Dr. Wehbe's Remicade Infusions**

59. As mentioned earlier, Cardoza reviewed the Remicade infusion records for the patients whose records were initially in the E/M review for Dr. Wehbe. Cardoza reported that all infusion services were lacking documentation. Cardoza informed me that she has reviewed Remicade infusion records written by other physicians, and she typically found documentation containing the following notes: 1) assessment of patient's vital signs before the infusion, as well as periodically during the infusion (anywhere from every 15 to 30 minutes); 2) patient's weight; 3) dose given; 4) lot number and expiration date from the vial(s) of Remicade infused; 5) name of person administering the Remicade; 6) site of administration; 7) size of needled used for infusion; 8) infusion rate; 9) time infusion started and ended; and 10) what substance was used to reconstitute the Remicade.

60. Cardoza reported that, "the doses and frequency of the administration of Remicade that was billed was suspect…" According to Cardoza, who relied on the May 2005 issue of "Drug Facts and Comparisons", the recommended dosage for Remicade is 3mg/kg given as an intravenous (IV) infusion followed with additional similar doses at 2 and 6 weeks after the first infusion, then every 8 weeks thereafter. The publication recommends administering Remicade in combination with methortexate. For patients who have an incomplete response, the guidelines

provide that the dose may be adjusted to 10/mg per kg or treatment as often as every 4 weeks. Cardoza found that Dr. Wehbe's records frequently lacked any record of the patient's weight, so it was not apparent how the dosage was calculated. One recipient was billed for 22 sessions for IV infusions of Remicade for dosages ranging from 300 mg to 700 mg every 2-3 weeks. No methotrexate was billed. The amount and frequency of the medication billed was well out of the recommended ranges

61. In addition to the Remicade services that were reviewed as part of the E/M code review, Cardoza performed data review for all 29 patients, as well as a medical record review for one patient (WW), who received Remicade between January 1, 2003 and June 1, 2006. Cardoza determined through billing data queries that out of 29 patients, only five were documented as having been tested for tuberculosis ("TB"), and none had received chest x-rays (that were billed by Dr. Wehbe) prior to the initiation of Remicade therapy or during the period of Remicade administration.

62. Cardoza reviewed WW's medical record due to his serious medical condition that was reported to the Rhode Island Department of Health. WW was a Remicade patient of Dr. Wehbe who was not tested for TB prior to or during Remicade therapy. The initial data showed that this patient had been treated with Remicade IV for two months prior to being hospitalized with fever, headache, night sweats, and suspicion of TB. WW was hospitalized four times between May 2, 2005 and December 8, 2005, at which time he was diagnosed with TB. Inpatient medical records were requested to understand WW's history and disease progression, as the medical records from Dr. Wehbe contained very little documentation of WW's history or treatment. Inpatient records showed that WW had a long history of TB. Dr. Wehbe's records for WW lacked any documentation of TB. The records also failed to substantiate the diagnosis of rheumatoid arthritis and the need of Remicade treatment.

63. The review of WW's medical records raised several concerns regarding the quality of medical care provided to the patient. Primary concerns were the lack of a TB screening prior to the initiation of Remicade therapy and the lack of follow through monitoring of the patient. During WW's 12-day admission to the hospital, WW was placed on a ventilator due to respiratory failure. WW received chest x-rays and a physical examination which showed opacity of the lungs and diminished breath sounds on the right side. Two days after WW was

discharged, he was readmitted for additional ventilation because a mediastinal mass was impinging on his right main stem bronchus and pulmonary artery.

64. WW was treated by Dr. Wehbe's office 25 times between January 2005 and March 2006. None of this pertinent medical treatment or patient history is documented in Dr. Wehbe's medical records. Cardoza's findings led her to conclude that Dr. Wehbe's treatment of this patient was outside the accepted standards of medical care. She summarized her findings as follows: 1) poor or no documentation to support services rendered; 2) poor documentation of patient histories or treatments; 3) lack of follow-up care; 4) inappropriate administration of Remicade including lack of screening for TB, improper dosing and lack of documentation of administration records; and 5) public health threat.

65. Dr. Maxim also found Dr. Wehbe's administration of Remicade to be troubling based on his medical review of the same records reviewed by Cardoza. Dr. Maxim was concerned that the doses and frequency of the Remicade administration was abnormal. The manufacturer's recommendation for administration is to dose on week 0, 2, 6, and every 8 weeks thereafter. Remicade can also be administered up to every 4 weeks, if needed. In the records Dr. Maxim reviewed, the patients received dosing as often as every two weeks, even after the initial dosing period. According to Dr. Maxim, Dr. Wehbe's methods of administering Remicade appeared to be excessive and potentially dangerous, given the drugs immuno-compromising effect. Additionally, Dr. Maxim noted that there was no documentation of the administration, including the site (place on patient's body) of administration, expiration dates, lot numbers or any post administration evaluation. If documentation was present it was a one-word notation of "Remicade" at the end of the note.

66. Dr. Maxim described to me what standards are associated with documentation related to the administration of any intravenous drugs. Some of the standards are: pre-administration assessment, including vital signs; notation of the site of administration; some notation on the degree in which the patient tolerated the procedures (i.e. side effects); lot number and expiration date of the drug; and results of tuberculosis test and absence of ongoing infections, if needed (before initial treatment). In addition, Dr. Maxim commented on Dr. Wehbe's billing of an E/M code with modifier 25 with most Remicade infusions. According to Dr. Maxim, modifier 25 should only be used if there is a distinctly separate service provided at the visit. The

administration codes for Remicade are inclusive of the visit code. In none of the Remicade administration visits were there any separately identifiable services documented.

**3. Example of patient dosing and administration**

67. I reviewed the medical records of one of Dr. Wehbe's Remicade patients for dates of services from April 1, 2004 through June 30, 2005. This patient will be referred to through his/her initials, "AS". The most AS weighed during this time period, according to the available documentation in the medical records, was 136 pounds. According the recommended dosing calculation, an individual weighing 136 pounds should be receiving approximately 185 mgs of Remicade during each infusion. According to the manufacturer's medication and prescribing guide, "for patients who have incomplete response, consideration may be given to adjusting the dose up to 10 mg/kg ***or*** treating the patient as often as every four weeks bearing in mind that risk of serious infections is increased at higher doses."

68. According to AS' Medicare paid-claims detail, AS has been receiving Remicade infusion approximately every two weeks since January 10, 2002. The doses started at 30mg, increased to 40mg on May 27, 2004, increased to 50mg on July 29, 2004, and alternated between 30mg, 40mg, 50mg, 60mg, 70mgs, and 80 mg between October 14, 2004 and March 11, 2005. AS continued to receive doses between 50mg and 80mg until at least March 21, 2006. During the time period of AS's Remicade treatment, there were instances where AS received as much as 1800mg of Remicade in a four-week period, more than twice the recommended dose. According to my calculations, had AS been receiving the recommended dose of 3mg per kg on the manufacturers recommended schedule, AS would have received 185mg on week 0, week 2, week 6, and week 14 (every 8 weeks after week 6). Thus, AS would have received a total of 740mg in 14 weeks. Even if AS's dose was increased to 10mg/kg on the manufacturer's recommended schedule, AS would have received 618mg on week 0, week 2, week 6, and week 14 (every 8 weeks after week 6), for a total of 2,472mg in 14 weeks.

69. According to my analysis of AS' billing records, between January 1, 2005 and April 9, 2005 (first 14 weeks in calendar year 2005), AS received a total of 3,600mg of Remicade (360 billable units), which is 1,128mg more than what AS would have received if her dose was increased to 10mg/kg, in accordance with the manufacturer's recommendations for unresponsive patients.

70. I reviewed Dr. Wehbe's Medicaid billings for AS's Remicade treatment. Dr. Wehbe billed 360 units and was reimbursed $15,271 for Remicade administered to AS between January 1, 2005 and April 9, 2005. If Dr. Wehbe dosed AS in accordance with the manufacturer's recommendations (3mg/kg), AS would have only received 74 units of Remicade during the same time period and Dr. Wehbe would have only been reimbursed $3,139. Accordingly, I believe that as a result of Dr. Wehbe's Remicade billing, there was a potential overpayment of $12,132.

**4. In-and-Out Analysis**

71. In connection with this investigation, Special Agent Robert Ferraro of the Internal Revenue Service reviewed Dr. Wehbe's and RMG's bank records. Through this review, it was determined that Wehbe's and RMG's suppliers of Remicade are McKesson Corporation, and Florida Infusion Inc. (hereafter "the suppliers"). Based on RMG bank records, it appears that McKesson and Florida Infusion are the only suppliers of Remicade to RMG. I received and analyzed detailed lists and invoices of Remicade quantities RMG and/or Dr. Wehbe purchased from these suppliers. In addition, I calculated the number of vials Dr. Wehbe billed to all insurance Carriers during 2004 and 2005.

72. In 2004, RMG[9] purchased 600 100mg-vials of Remicade from the suppliers. In 2004, Dr. Wehbe billed the Carriers for 1036 100mg vials of Remicade (10360 billable units, representing 10mg each)[10]. This calculation shows that RMG billed for 436 more 100mg-vials of Remicade than it purchased from the suppliers. At an average reimbursement rate of $75.49 per 10 mg, that would result in an overpayment of $329,136.40, assuming Dr. Wehbe used and billed every unit of Remicade he purchased. In 2005, RMG purchased 591 100mg-vials of Remicade from the suppliers. In 2005, Dr. Wehbe billed the Carriers for 1047.7 100mg-vials of Remicade (10477 billable units representing 10mg each). This calculation shows that Dr. Wehbe billed for 456.7 more 100mg-vials of Remicade than he purchased from the suppliers. At an average reimbursement rate of $56.44 per 10 mg, that would result in an overpayment of $257,761.48, assuming Dr. Wehbe used and billed every unit of Remicade he purchased.[11]

---

[9] All Remicade purchases made by either RMG or Dr. Wehbe were considered for the "amount purchased" calculations. The amount purchased was compared to only Remicade billings where Dr. Wehbe was listed as the rendering physician. It should be noted that Remicade billings by other physicians in the practice appears to be negligible.

[10] One billable unit of Remicade is equivalent to 10 milligrams.

[11] While it is possible that the overage could be explained by pre-existing supplies of Remicade that are kept by RMG, RMG's ordering practices suggest that RMG orders Remicade as needed, throughout the year, rather than in a consistent pattern. Furthermore, unreconsituted Remicade must be kept refrigerated. According to

| | 2004 | | 2005 | | 2004 & 2005 | | |
|---|---|---|---|---|---|---|---|
| Carrier | 10 mg Units | 100mg vials | 10mg units | 100mg vials | Total units 10mg units | Units 100mg vials | Total Reimbursements |
| Blue Cross - Rite Care | 120 | 12 | 820 | 82 | 940 | 94 | $ 55,178.00 |
| Blue Cross - Private | 0 | 0 | 0 | 0 | 0 | 0 | $ - |
| United Health Care | 510 | 51 | 1720 | 172 | 2230 | 223 | $ 145,059.00 |
| NHPRI | 1760 | 176 | 1217 | 121.7 | 2977 | 297.7 | $ 149,331.24 |
| Medicare | 4770 | 477 | 4060 | 406 | 8830 | 883 | $ 396,435.78 |
| Medicaid | 3200 | 320 | 2660 | 266 | 5860 | 586 | $ 354,216.80 |
| Total Billed to Insurances | 10360 | 1036 | 10477 | [illegible] | 20837 | 2083.7 | $ 1,100,220.82 |
| | | | | | | | |
| Total Purchased from McKesson | 5200 | 520 | 5200 | 520 | 10400 | 1040 | |
| Total Purchased from Florida Inf | 800 | 80 | 710 | 71 | 1510 | 151 | |
| Total Purchased | 6000 | 600 | 5910 | 591 | 11910 | 1191 | |
| Billed more than purchased | 4360 | 436 | 4567 | 456.7 | 8927 | 892.7 | |
| | | Overage | Overpayment | | | | |
| 2004 Ave. reimbursement /10 mg | $75.49 | 4360 | $ 329,136.40 | | Total Pd to Suppliers | | $ 622,574.70 |
| 2005 Ave. reimbursement /10 mg | $56.44 | 4567 | $ 257,761.48 | | | | |
| APPROXIMATE OVERPAYMENT | | | $ 586,897.88 | | Total Net Profit | | $ 477,646.12 |

73. The chart above compares Dr. Wehbe's Remicade billings to his Remicade purchases for 2004 and 2005. During this time period, Dr. Wehbe paid the suppliers $622,574 for Remicade. As a result of the claims submitted to the Carriers, Dr. Wehbe was reimbursed $1,100,220 and made a net profit of $477,646.12.

74. As discussed earlier in this affidavit, Remicade dosing is dependent upon the patient's body weight. In 2004, Medicaid had an upper limit of 40 billable units per patient. In 2005, Medicaid had an upper limit of 50 billable units per patient. I reviewed Dr. Wehbe's 2004 and 2005 Medicaid billing for Remicade infusions. The billing data showed that Dr. Wehbe billed the maximum allowable units per infusion for <u>every</u> Medicaid patient receiving Remicade. This billing pattern would indicate that all of Dr. Wehbe's Medicaid patients receiving Remicade weighed about the same amount. The corresponding weights for individuals receiving doses of

<u>www.medsafe.gov.mz</u>. Remicade may be kept for up to 36 months when stored at 2°C to 8°C. Once Remicade is reconstituted, that is diluted in 0.9% sodium chloride, it is biochemically stable for 24 hours. However, it is recommended that the infusion begin within three hours after preparation. Any unused portion of the Remicade must be discarded. Accordingly, it is my belief, based on information presently available, that the overage cannot be simply explained by pre-existing stock.

400 and 500[12] milligrams is approximately 293 pounds for 400 milligrams and 367 pounds for 500 milligrams.

75. By maximizing the units billed, Dr. Wehbe maximized his reimbursement. Utilizing the same example set forth earlier in this affidavit, Dr. Wehbe billed 360 units and was reimbursed $15,271 for Remicade administered to AS between January 1, 2005 and April 9, 2005. If Dr. Wehbe dosed AS in accordance with the manufacturer's recommendations (3mg/kg), AS would have only received 74 units of Remicade during the same time period, and Dr. Wehbe would have only been reimbursed $3,139, a difference of $12,132.

76. In addition to the dosing and billing discrepancies mentioned above, according to Dr. Wehbe's billing patterns, he does not follow the manufacturer's recommended dosing schedule (initial, week 2, week 6, every 8 weeks thereafter). Dr. Wehbe bills for bi-weekly infusions for most of his patients.

**F. UNDERCOVER OPERATION**

77. This investigation also included an undercover operation in which a law enforcement agent ("UC") presented himself as a patient to Dr. Wehbe. Each of the UC's office visits to Dr. Wehbe were monitored and audio-recorded. Following each visit, I reviewed Dr. Wehbe's Medicare E/M billing for the UC.

78. In this case, the undercover first presented himself on January 24, 2006, as an individual new to the area who was seeking a primary care physician. The UC stated that he was insured by BCBSRI. The UC was initially seen by a nurse who recorded his weight and height and checked his blood pressure and pulse. During the examination, Dr. Wehbe and the UC discussed the UC's complaint of lower back pain and occasional episodes of high cholesterol. Dr. Wehbe informed the UC that in order to test for cholesterol, the UC would have to fast.

79. On January 26, 2006, BCBSRI received a claim from Dr. Wehbe's office for the services provided by Dr. Wehbe to UC on January 27, 2006. The claim was for a 99204 E/M visit and 14 laboratory services, including a laboratory test for cholesterol. The 99204 code is defined in the CPT manual as an "office or other outpatient visit for the evaluation and management of a new patient, which requires three key components: 1) a comprehensive history; 2) a comprehensive

12 400 and 500 milligrams is equivalent to 40 and 50 billable units, the maximum billable units for Medicaid in 2004 and 2005.

examination; and 3) a medical decision making of moderate complexity. Usually, the presenting problem(s) are of moderate to high severity. Physicians typically spend 45 face-to-face with the patient and/or family."

80. According to the observations of the UC and the recorded conversation, Dr. Wehbe entered the examination room at 3:58:46 p.m., conducted his examination as detailed above, and left the examination room at 4:02:30 pm. Thus, the examination that was billed as E/M code 99204, which typically takes 45 minutes, actually lasted just 4 minutes and 44 seconds. In addition, a cholesterol test was ordered and billed, despite Dr. Wehbe's knowledge that the UC was not fasting.

81. On January 27, 2006, BCBSRI paid Dr. Wehbe $400.22 for the services rendered to the UC on January 24, 2006.

82. The UC saw Dr. Wehbe for a follow-up visit on February 7, 2006. During this visit, Dr. Wehbe told the UC that his blood work was fine, but that his cholesterol was a "little high." Dr. Wehbe questioned UC as to whether or not he was fasting. UC told him that he was not fasting at which time Dr. Wehbe told the UC that he should fast for the next appointment for a physical.

83. On February 10, 2006, BCBSRI received a claim for reimbursement from Dr. Wehbe's office for the services rendered by Dr. Wehbe to the UC on February 7, 2006. The claim was for a 99213 E/M visit. CPT code 99213 is defined by the AMA as an, "Office or other outpatient visit for the evaluation and management of an established patient, which requires at least two of three key components: 1) An expanded problem focused history; 2) An expanded problem focused examination; and 3) A medical decision of low complexity. Usually, the presenting problem(s) are of low to moderate severity. They physician typically spends 15 minutes face-to-face with the patient."

84. According to the observations of the UC and the recorded conversation, Dr. Wehbe initially entered the examination room at 2:54:20 p.m., left to obtain UC's laboratory results at 2:54:44 p.m., and returned at 2:56:12 p.m.. Dr. Wehbe conducted his examination as detailed above. The examination ended at 2:58:42 p.m.. Thus, the examination that was billed as E/M code 99213, which typically takes 15 minutes, lasted about two minutes.

85. On February 13, 2006, BCBSRI paid Dr. Wehbe $40.70 for the services rendered to the UC on February 7, 2006.

86. On March 7, 2006, the UC saw Dr. Wehbe for a scheduled physical. Prior to seeing Dr. Wehbe, the UC had his blood drawn by a nurse. During the physical, Dr. Wehbe questioned the UC about his medical history, concentrating on cholesterol. Dr. Wehbe checked the UC's spine by tapping his spinal area, listened to his lungs, checked his blood pressure, and inspected his stomach and genital areas. According to the UC's report, Dr. Wehbe spent approximately six minutes with the UC. Dr. Wehbe scheduled the UC for an EKG and a follow-up appointment on May 30, 2006.

87. On March 17, 2006, BCBSRI received a claim for reimbursement from Dr. Wehbe's office for the services rendered to the UC on March 7, 2006. The claim submitted was for a 99396 E/M visit and eleven laboratory tests, including cholesterol. The E/M code 99396 is defined by the CPT manual as a "periodic comprehensive preventive medicine reevaluation and management of an individual including age and gender appropriate history, examination, counseling/anticipatory guidance/risk factor reduction intervention, and the ordering of appropriate immunization(s), laboratory/diagnostic procedures, established patient; [40-64 years old]."

88. All of the laboratory tests submitted for payment in March had been previously performed during the UC's first visit on January 24, 2006. Other than the cholesterol examination (which should have never been performed in January because Dr. Wehbe knew that the UC was not fasting), all the other tests came back normal. Dr. Wehbe nevertheless chose to repeat all the tests, and not just the cholesterol test.

89. Although procedure code 99396 does not have a typical time assigned to it, I have been advised by Dr. Maxim that this E/M visit typically takes approximately 40 minutes. In this case, the UC was only seen by Dr. Wehbe for approximately six minutes.

90. On March 17, 2006, BCBSRI paid Dr. Wehbe $220.56 for the services rendered to the UC on March 7, 2006.

## G. TOTAL CARRIER REIMBURSEMENTS

91. The chart below represents all the paid-claims to Dr. Wehbe by the Carriers for the time periods listed. These claims were paid into RMG's checking account as further described below.

| Wehbe Payment Totals | | | | | | | |
|---|---|---|---|---|---|---|---|
| | MEDICAID | MEDICARE | BCBS RITE | BCBS PRIVATE | UHC PRIVATE | NHPRI | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| DATES | 9/1/01-7/5/05 | 1/2/02-6/14/05 | 10/1/01-7/8/05 | 1/2/02-11/1/05 | 1/2/02-10/31/05 | 1/10/00-6/29/05 | 1/10/00-10/31/05 |

92. Based upon the investigation, I believe that there is probable cause to believe that a significant portion of these payments were based on fraudulent claim submissions by Dr. Wehbe. As set forth above, audits conducted by the Carriers, based on peer reviews and patient based reviews, as well as the UC operation demonstrate that Dr. Wehbe consistently bills for services that are not medically necessary, upcodes claims, and bills for claims lacking any supporting documentation. Such upcoding, if it occurs over a lengthy period of time, could result in tens of thousands of dollars in overpayment by the Carriers. Furthermore, Dr. Wehbe's Remicade claims also suggest that he is overbilling the carriers. My analysis of Dr. Wehbe's Remicade billings shows, for example, that he routinely billed the upper limit allowed by Medicaid. As set forth above, the frequency and dosing of Remicade by Dr. Wehbe is consistent with high reimbursement rates, and is not consistent with medically reasonable administration of an extremely potent, immuno-compromising medication. As set forth above, Dr. Wehbe's Remicade administration also raises a significant public health concern.

## IV. THE CITIZEN BANK ACCOUNTS

93. In connection with this investigation, IRS Special Agent Robert Ferraro analyzed the bank accounts of Tarek Wehbe and RMG. Agent Ferraro reviewed records from Citizens Bank and determined that account number 1103-411-4 belongs to Renaissance Medical Group ("the RMG account"). Agent Ferraro reviewed monthly account statements, signature cards, wire transfers, and other documents. Based on this review, Agent Ferraro determined that Dr. Tarek W. Wehbe is the only signatory of the RMG account. Agent Ferraro also determined that Dr. Wehbe routinely withdraws large sums of money from this account (totaling in the hundreds of

thousands of dollars) and deposits these withdrawals in his personal accounts. At times, large sums of money are cashed or have not been able to be traced.

94. As part of this analysis, Agent Ferraro identified those payments made by Medicaid to RMG in 2004 and 2005. As set forth in the section on Medicaid Patient-Based Review, ¶¶ 31-37 above, a Medicaid review for the time period of April 1, 2004 to June 20, 2005 concluded that over 90% of the claims submitted by Dr. Wehbe to Medicaid were fraudulent in that they were upcoded, undocumented, or medically unnecessary. Medicaid paid RMG for these claims via direct deposits into the RMG account, as documented in the remittance advice.[13]

95. Agent Ferraro's review showed that in 2004, the Rhode Island Assistance Program (Medicaid) deposited a total of $673,473.67 into the RMG account. During the period of January 1, 2005 to September 2, 2005, the Rhode Island Assistance Program (Medicaid) deposited a total of $623,449.22 into the RMG account. For the reasons set forth above, I believe that many of these funds were deposited into the RMG account as a result of false claims submitted to Medicaid by RMG and Dr. Wehbe.

96. In addition to the Medicaid payments, checks sent by the other Carriers to RMG were also deposited into the RMG account. As set forth in ¶ 92 above, Dr. Wehbe was paid over $10,000,000 by the Carriers from 2000-2005. Based on the evidence contained in this affidavit, there is probable cause to believe that a significant portion of these payments were based on false claims submitted by Dr. Wehbe.

97. The RMG account is the primary business account for RMG. This account is used to promote the specified unlawful activity of healthcare fraud, 18 U.S.C. §§ 1347, 1956(a)(1)(A)(i) & (c)(7)(F), in that it is used to pay rent for the medical offices of RMG, as well as pay RMG's pharmaceutical suppliers. Agent Ferraro analyzed payments made from this account in 2004 and 2005 and determined that, among other things, funds from this account were used to pay the rent for RMG's Providence and North Providence Offices, as well as suppliers of pharmaceutical products and services, including Remicade.

98. The chart below lists monthly payments out of RMG's Citizens Bank account to Atlantis Management Corp. This investigation has revealed that Atlantis Management owns RMG's

[13] The remittance advice is a document created by Medicaid which lists the claims paid by Medicaid on a particular date for a given provider.

Providence and North Providence Offices. Rhode Island Secretary of State records indicate that Dr. Wehbe owns and is the registered agent for Atlantis Management Corp.

| Date | Ck # | Amount | Payee |
|---|---|---|---|
| 1/29/2004 | 3210 | $ 12,150.00 | Atlantis Management |
| 2/19/2004 | 3301 | $ 17,150.00 | Atlantis Management |
| 3/21/2004 | 3401 | $ 17,150.00 | Atlantis Management |
| 4/29/2004 | 3505 | $ 17,150.00 | Atlantis Management |
| 6/1/2004 | 3615 | $ 17,150.00 | Atlantis Management |
| 7/1/2004 | 3697 | $ 17,150.00 | Atlantis Management |
| 7/30/2004 | 3790 | $ 17,150.00 | Atlantis Management |
| 8/21/2004 | 3863 | $ 17,150.00 | Atlantis Management |
| 9/24/2004 | 3967 | $ 17,150.00 | Atlantis Management |
| 11/1/2004 | 4106 | $ 17,150.00 | Atlantis Management |
| 12/3/2004 | 4217 | $ 17,150.00 | Atlantis Management |
| 1/12/2005 | 4339 | $ 17,150.00 | Atlantis Management |
| 2/5/2005 | 4423 | $ 17,150.00 | Atlantis Management |
| 3/24/2005 | 4468 | $ 17,150.00 | Atlantis Management |
| 4/1/2005 | 4584 | $ 17,150.00 | Atlantis Management |
| 4/28/2005 | 4684 | $ 17,150.00 | Atlantis Management |
| 5/26/2005 | 4787 | $ 17,150.00 | Atlantis Management |
| 7/1/2005 | 4927 | $ 17,150.00 | Atlantis Management |
| 9/22/2005 | 5186 | $ 17,150.00 | Atlantis Management |
| 10/20/2005 | 5292 | $ 17,150.00 | Atlantis Management |
| 11/26/2005 | 5413 | $ 17,150.00 | Atlantis Management |
| | **Total** | **$355,150.00** | |

99. The charts below list payments made by RMG to the pharmaceutical distributors, McKesson Corporation, One Post Street, San Francisco, California, and Florida Infusion Inc, 1053 Progress Court, Palm Harbor, Florida, in 2004 and 2005. I have reviewed RMG invoices provided by Florida Infusion and McKesson for the period of 2004-2006. I found that RMG regularly orders pharmaceutical products and services from these corporations. Specifically, I found that RMG purchases Remicade and other antirheumatic drugs ("DMARDs"), such as methotrexate, from McKesson and Florida Infusion.

| Date | Ck # | Amount | Payee |
|---|---|---|---|
| 1/5/2004 | 3116 | $ 10,420.00 | Florida Infusion / Nations Drug |
| 3/21/2004 | 3416 | $ 23,111.69 | Florida Infusion / Nations Drug |
| 4/29/2004 | 3501 | $ 19,360.60 | Florida Infusion / Nations Drug |
| 5/21/2004 | 3575 | $ 5,316.00 | Florida Infusion / Nations Drug |
| 6/16/2004 | 3612 | $ 6,764.98 | Florida Infusion / Nations Drug |
| 6/16/2004 | 3636 | $ 6,764.98 | Florida Infusion / Nations Drug |
| 6/24/2004 | 3672 | $ 4,775.00 | Florida Infusion / Nations Drug |
| 7/1/2004 | 3706 | $ 11,992.39 | Florida Infusion / Nations Drug |
| 8/11/2004 | 3830 | $ 15,547.70 | Florida Infusion / Nations Drug |
| 8/21/2004 | 3850 | $ 49,615.00 | Florida Infusion / Nations Drug |
| 9/16/2004 | 3946 | $ 6,139.40 | Florida Infusion / Nations Drug |
| 10/5/2004 | 4013 | $ 45,785.20 | Florida Infusion / Nations Drug |
| 10/8/2004 | 4029 | $ 6,085.00 | Florida Infusion / Nations Drug |
| 11/1/2004 | 4107 | $ 16,716.97 | Florida Infusion / Nations Drug |
| 11/29/2004 | 4166 | $ 4,850.00 | Florida Infusion / Nations Drug |
| 11/29/2004 | 4171 | $ 43,440.80 | Florida Infusion / Nations Drug |
| 12/3/2004 | 4183 | $ 26,686.37 | Florida Infusion / Nations Drug |
| 12/11/2004 | 4226 | $ 17,976.00 | Florida Infusion / Nations Drug |
| 2/10/2005 | 4427 | $ 42,152.08 | Florida Infusion / Nations Drug |
| 3/11/2005 | 4515 | $ 33,958.10 | Florida Infusion / Nations Drug |
| 4/25/2005 | 4676 | $ 24,217.69 | Florida Infusion / Nations Drug |
| 4/25/2005 | 4678 | $ 24,217.69 | Florida Infusion / Nations Drug |
| 5/18/2005 | 4759 | $ 16,335.80 | Florida Infusion / Nations Drug |
| 6/21/2005 | 4901 | $ 10,030.36 | Florida Infusion / Nations Drug |
| | **Total** | **$472,259.80** | |

| Date | Ck# | Amount | Payee |
|---|---|---|---|
| 4/29/2004 | 3500 | $ 11,482.99 | McKesson General Medical Co. |
| 5/13/2004 | 3554 | $ 10,380.00 | McKesson General Medical Co. |
| 5/13/2004 | 3557 | $ 3,910.16 | McKesson General Medical Co. |
| 6/21/2004 | 3652 | $ 10,380.00 | McKesson General Medical Co. |
| 6/28/2004 | 3677 | $ 3,980.77 | McKesson General Medical Co. |
| 8/3/2004 | 3813 | $ 36,330.00 | McKesson General Medical Co. |
| 9/3/2004 | 3907 | $ 41,520.00 | McKesson General Medical Co. |
| 9/8/2004 | 3734 | $ 25,950.00 | McKesson General Medical Co. |
| 10/12/2004 | 4036 | $ 41,520.00 | McKesson General Medical Co. |
| 10/20/2004 | 4048 | $ 7,979.23 | McKesson General Medical Co. |
| 11/4/2004 | 4118 | $ 41,520.00 | McKesson General Medical Co. |
| 12/3/2004 | 4211 | $ 41,720.00 | McKesson General Medical Co. |
| 12/13/2004 | 4246 | $ 10,310.23 | McKesson General Medical Co. |
| 1/12/2005 | 4337 | $ 20,960.00 | McKesson General Medical Co. |
| 1/18/2005 | 4358 | $ 5,323.48 | McKesson General Medical Co. |
| 2/4/2005 | 4422 | $ 15,720.00 | McKesson General Medical Co. |
| 2/10/2005 | 4424 | $ 10,072.83 | McKesson General Medical Co. |
| 3/7/2005 | 4497 | $ 21,440.00 | McKesson General Medical Co. |
| 4/10/2005 | 4630 | $ 68,120.00 | McKesson General Medical Co. |
| 4/14/2005 | 4638 | $ 7,976.16 | McKesson General Medical Co. |
| 5/3/2005 | 4718 | $ 5,607.42 | McKesson General Medical Co. |
| 6/7/2005 | 4829 | $ 8,414.74 | McKesson General Medical Co. |
| 7/22/2005 | 4976 | $ 9,011.44 | McKesson General Medical Co. |
| 10/6/2005 | 5228 | $ 30,697.20 | McKesson General Medical Co. |
| 10/7/2005 | 5256 | $ 10,753.79 | McKesson General Medical Co. |
| 11/14/2005 | 5368 | $ 30,697.80 | McKesson General Medical Co. |
| 11/15/2005 | 5371 | $ 5,472.00 | McKesson General Medical Co. |
| 12/12/2005 | 5483 | $ 13,559.37 | McKesson General Medical Co. |
| 12/13/2005 | 5474 | $ 30,697.80 | McKesson General Medical Co. |
| | **Total** | **$581,507.41** | |

100. Agent Ferraro's review of the account activity for RMG account number 1103-411-4 for 2004 and 2005 also revealed numerous checks issued by Tarek Wehbe payable to himself, "Tarek Wehbe," out of this checking account. As set forth above, Wehbe also pays Atlantis Management, a corporation which he owns, out of the RMG account. The following chart sets forth checks drawn on RMG's account which were then either cashed or deposited by Dr. Wehbe into various personal bank accounts:

| Date | [illegible] | Amount | Payee | Deposit Date | Acct. Deposited | Account Name | Type of Account |
|---|---|---|---|---|---|---|---|
| /14/2004 | can not read | $ 400,000.00 | Dr. Tarek Wehbe | 1/20/2004 | 994-984-4 | Tarek Wehbe | Circle Gold - Checking |
| 03/06/2004 | 3338 | $ 1,000,000.00 | Tarek Wehbe | 3/08/2004 | Cashed | | |
| 04/24/2004 | 3488 | $ 52,930.93 | Dr. Tarek Wehbe | 5/03/2004 | 45-980510 | Tarek Wehbe | Circle - Savings |
| 04/14/2004 | 3446 | $ 350,000.00 | Tarek Wehbe | Unknown | Unknown | | |
| 05/03/2004 | 3539 | $ 500,000.00 | Dr. Tarek Wehbe | 5/18/2004 | 45-980510 | Tarek Wehbe | Circle - Savings |
| 09/06/2004 | 3911 | $ 850,000.00 | Tarek Wehbe | 9/07/2004 | 45-980510 | Tarek Wehbe | Circle - Savings |
| 12/08/2004 | 4222 | $ 1,300,000.00 | Tarek Wehbe | 12/08/2004 | Cashed | | |
| 03/30/2005 | 4574 | $ 700,000.00 | Tarek Wehbe | 3/30/2005 | 994-984-4 | Tarek Wehbe | Circle Gold - Checking |
| 05/27/2005 | 4799 | $ 200,000.00 | Tarek Wehbe | Unknown | Unknown | | |
| 05/27/2005 | 4800 | $ 500,000.00 | Tarek Wehbe | 5/31/2005 | 1564-942-3 | Tarek & Mathilda Wehbe | Circle Gold - Checking |
| 07/12/2005 | 4940 | $ 200,000.00 | Tarek Wehbe | 7/12/2005 | 1564-942-3 | Tarek & Mathilda Wehbe | Circle Gold - Checking |
| 08/05/2005 | 5036 | $ 300,000.00 | Tarek Wehbe | 8/08/2005 | 994-984-4 | Tarek Wehbe | Circle Gold - Checking |
| 08/23/2005 | 5092 | $ 200,000.00 | Tarek Wehbe | 8/24/2005 | 994-984-4 | Tarek Wehbe | Circle Gold - Checking |
| 09/30/2005 | 5225 | $ 350,000.00 | Tarek Wehbe | 10/03/2005 | 994-984-4 | Tarek Wehbe | Circle Gold - Checking |
| 11/06/2005 | 5337 | $350,000.00 | Tarek Wehbe | Unknown | Unknown | | |

101. Agent Ferraro reviewed each of the checks listed above, and has determined that each of them had the endorsement, "Tarek Wehbe." As the chart shows, on two occasions checks totaling $700,000.00 were deposited into the personal bank account of Tarek and Mathilda Wehbe, account number 1564-942-3 ("the Wehbe account"). Based on the information contained in this Affidavit, there is probable cause to believe that these transfers constitute proceeds traceable to unlawful activity by Dr. Wehbe and RMG, and are therefore subject to seizure pursuant to 18 U.S. C. §981(a)(1). Further, based on my training and experience, I believe that Dr. Wehbe's pattern of withdrawing and cashing large sums of money from the RMG Account and re-depositing funds into various personal accounts, including the Wehbe account, and accounts owned by identity of interest companies owned by Dr. Wehbe (such as the Atlantis Management account), may be done in order to conceal the source and the nature of the funds, in violation of 18 U.S.C. §1956(a)(1).

## IV. ITEMS TO BE SEIZED

### A. RECORD RETENTION REQUIREMENTS

102. Medicare requires providers such as Dr. Wehbe to retain records for a period of seven years. Medicaid requires providers to retain records for a period of ten years. The retention terms are outlined in each Carrier's Provider Agreement, which were signed by Dr. Wehbe. Given the retention requirements, as well as the nature of the medical practice, I believe that there may be found on the premises of RMG's Providence and North Providence Offices documents, patient records, financial and business records, as further described in Attachment B to this Affidavit, dating back to at least 1999. Based on my training and experience in health care fraud investigations, I believe that these records constitute evidence of the ongoing criminal activity by Dr. Wehbe and RMG as outlined throughout this affidavit.

### B. DR. WEHBE'S USE OF COMPUTERS

103. The Carriers have informed me that Wehbe submits claims electronically to Medicare, Medicaid, and the private insurers. I have also been informed that RMG submits the claims itself, rather than utilize an outside billing company. During the UC operation, the UC witnessed employees using computers.

104. Based on my experience and training, I have learned the following information in relation to searches of computers and computer-related equipment:

A. Evidence seized from computers almost always requires agents to seize most or all of the electronic storage devices to be searched later by a qualified computer expert in a laboratory or other controlled environment. This is because when a user wants to conceal criminal evidence, he/she can store it in random order with deceptive files names. This requires searching authorities to examine all stored data to determine which particular files are included in the warrant. This sorting process can take weeks or months depending on the volume of data stored and is best accomplished in a laboratory or other controlled environment. It is impractical to attempt to retrieve this kind of data on site.

B. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and

applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password- protected, or encrypted files. Since computer evidence is vulnerable to tampering or destruction (both from external sources or from destructive codes imbedded in the system as a "booby trap"), the controlled environment of a laboratory is important to its complete and accurate analysis.

C. In order to fully retrieve data from a computer system, the analyst needs all magnetic storage devices as well as the central processing unit (CPU). In addition, the analyst needs all the computer software, including system software (operating systems or interfaces, and hardware drivers) and any application for which software may have been used to create the data (whether stored on hard drives or on external media).

D. Computer software is digital information for which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic magnetic, optical, or other digital form, and it commonly includes programs to run operating systems, applications (like word processing, graphics, or spreadsheet program), utilities, compilers, interpreters, and communication programs.

E. Computer-related documentation consists of written, recorded, printed, or electronically stored materials for which explains or illustrates how to configure or use computer hardware, software, or other related items.

F. Computer hardware-software, documentation, passwords and security devices may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits or evidence of a crime and/or (2) the objects may have been used to collect and store information about crimes in the form of electronic data.

G. Searching computerized information for evidence or instrumentalities of crime commonly requires agents to seize most or all of a computer system's input/output peripheral devices, storage media, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment. The peripheral devices, which allow users to enter or retrieve data from the storage devices, vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output devices in order to

read the data on the system. It is important that the analyst be able to properly reconfigure the system as it now operates in order to accurately retrieve the evidence listed above.

H. Because of the complexities of searching computer systems, it is useful for the computer analyst to have ready access after the seizure to any storage media, containing relevant material.

I. In a typical case, the analyst will make a mirror image of the original storage media. In order to preserve the evidence as carefully as possible it is preferable for the government to maintain the complete original storage media in its entirely, even if it contains information not specified in the warrant. In order to limit the unintended and undesired effect of limiting the RMG's ability to engage in legitimate business as a result of the seizure of computers and electronic media, the agents who execute the search will take an incremental approach. This incremental approach, which will be explained to all of the agents on the search team before the search is executed, will proceed as follows:

a. Upon arriving at the target locations, an electronic "image" of the information stored on the computer(s). Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Imaging a computer permits the agents to obtain an exact copy of the computer's stored data without actually seizing the computer hardware. The computer expert or another technical expert will then conduct an off-site search for the computer files described in the warrant from the "mirror image" copy at a later date. If the computer expert successfully images the computers, the agents will not conduct any additional search or seizure of the computers.

b. If "imaging" on-site proves impractical, or even impossible for technical reasons, then the agents will seize those components of the computer system that the computer expert believes must be seized to permit the agents to locate the computer files described in the warrant at an off-site location. The components will be seized and taken into the custody of law enforcement agents. If, after inspecting the computers, the analyst determines that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it within a reasonable time.

**C. PATIENT FILES**

105. Attachment C to this Affidavit lists 460 patient medical files to be seized. This list was determined through a statistically valid random sample ("SVRS"), developed by CMS

statisticians. Based upon my training and experience in these types of investigation, I know that SVRS is an accepted method to investigate fraudulent billing patterns by a medical practice. Since large medical practices, such as RMG, have thousands of patients, it is impractical to review each and every patient file. Accordingly, a random, statistically valid, sample of files is reviewed. In this case, in addition to those patient records picked at random, your affiant is also seeking to seize the medical records for all patients receiving Remicade infusions by Dr. Wehbe, as well as the medical records of the UC. Because the patients were selected at random, your affiant believes that patient files may be found in both the Providence and the North Providence Offices.

## V. CONCLUSION

106. Based upon the information contained in this Affidavit, there is probable cause to believe that from at least January 2000 to the present, Dr. Tarek Wehbe has knowingly and willfully executed a scheme and artifice to defraud health care benefit programs, to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, or under the custody and control of the Medicare, Medicaid, and private health care programs, in connection with the delivery and or payment for health care benefits, items, and services, all in violation of 18 U.S.C. § 1347 (health care fraud). Similarly, there is probable cause to believe that for the same time period, Dr. Tarek Wehbe knowingly presented false, fictitious, and fraudulent claims to a department and agency of the United States, in violation of 18 U.S.C. §§ 287 (false claims), 1001 (false statements), and 1031 (false statements relating to health care matters). Furthermore, in light of the fact that Dr. Wehbe and RMG presented these false claims to the Carriers by means of electronic transmission, there is probable cause to believe that Dr. Wehbe and RMG committed wire fraud in violation of 18 U.S.C. § 1343. Finally, as all the Carriers, with the exception of Medicaid, paid RMG with checks delivered through the mail, based on false claims presented by Dr. Wehbe and RMG, there is probable cause to believe that Dr. Wehbe and RMG committed mail fraud in violation of 18 U.S.C. § 1341.

107. Because of Medicare and Medicaid's document retention policies, as well as the nature of the medical practice, I believe that there exists probable cause to search the Providence Office and the North Providence Office for items listed in Attachment B to this Affidavit, including but not limited to, documents, digital records, electronically stored records, patient medical records

for those patients listed in Attachment C, records of supplies and drugs purchased and administered by Dr. Wehbe, business and financial records of RMG, as well as records related to the disposition of the proceeds of these fraudulent activities. The items to be seized, which are set forth in Attachment B, all constitute evidence of crimes, contraband, fruits of crimes, items illegally possessed, and property designed for use, intended for use, and used in committing crimes, in violation of 18 U.S.C. §§ 1374 (health care fraud), 287 (false claims), 1001 (false statements), 1031 (false statements relating to health care matters), 1341 (mail fraud), 1343 (wire fraud), and 1956 (money laundering).

108. Based upon the foregoing, there is probable cause to believe that the RMG Account, Citizens Bank account number 1103-411-4 constitutes evidence of the commission of a criminal offense, or constitutes contraband, fruits of the crime, or things otherwise criminally possessed within the meaning of Fed. R. Crim. P. 41(b), and are subject to forfeiture and seizure pursuant to 18 U.S.C. §§ 981(a)(1)(A).

109. There is also probable cause to believe that the RMG Account, Citizens Bank account number 1103-411-4 is used to promote "activity constituting an offense involving a Federal heath care offense," in violation of 18 U.S.C. § 1956 (a)(1) and (c)(7)(F), and that said account contains the traceable proceeds from the above violations. As set forth above, the RMG Account were used to pay pharmaceutical suppliers of Remicade as well as the management company that owns RMG's Providence and North Providence Offices. Thus, the RMG Account is forfeitable to the United States pursuant to 18, U.S.C. § 981(a)(1)(A), in that it constitutes property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956(a)(1) or constitute property traceable to such violation.

110. Based upon the foregoing, there is also probable cause to believe that the Wehbe Account, Citizens Bank account number 0015649423, constitutes evidence of the commission of a criminal offense, or constitutes contraband, fruits of the crime, or things otherwise criminally possessed within the meaning of Fed. R. Crim. P. 41(b), and is subject to forfeiture and seizure pursuant to 18 U.S.C. § 981(a)(1)(A), in that that said account is used to conceal the proceeds of specified unlawful activity (healthcare fraud), in violation of 18 U.S.C. § 1956(a)(1).

111. Wherefore, your affiant asks that the Court issue search warrants for the locations listed in ¶¶ 5(a) and 5(b) above and further described in Attachments A1 and A2 of this Affidavit, for those items listed in Attachments B and C to this Affidavit. Your affiant further asks the Court to issue seizure warrants for the accounts described ¶¶ 5(c) and 5(d) above.

L M McCarthy
Lisa McCarthy
Special Agent
Health and Human Services
Office of Inspector General

Subscribed and sworn to before me,
this 12th day of DEC. 2006 in
the District of Rhode Island

Hon. Lincoln D. Almond
United States Magistrate Judge